United States v. Sean Forehand United States v. Sean Forehand Good afternoon. May it please the Court, my name is Andrea Bergman and I represent Sean Forehand. If you could pull that closer, somehow it's not coming across. Is that better? That's a little better, thank you. If I may reserve three minutes for rebuttal, please. In this case, the District Court clearly erred in accepting Officer Allen's testimony because it was flatly contradicted by documentary evidence. The officer impermissibly extended the motor vehicle stop in this case because he decided to search the occupants without a legal basis to do so. In his own words, after he had already resolved the reasons for the initial stop, he told his partner that he was going to get that guy out and he called for backup. At that moment, the stop was impermissibly extended without a reasonable suspicion. Make no mistake, in this case, Officer Allen testified at a time when neither he nor the U.S. Attorney knew that a copy of the police cruiser's videotape of the stop was in possession of the defense. The officer testified untruthfully on numerous facts that were shown not to be true in the videotape, and the District Court committed clear error in accepting that testimony and its factual findings. When you look at the clear error standard, it does not assume that there is no evidence to support the finding. It is that although there may be some evidence to support it, the reviewing court on the entire record is left with a definite and firm conviction that a mistake has been made. In this case, if this case can't meet the standard, then I would suggest that no case could and that it would render the standard completely meaningless. The government suggests that this was simply a credibility determination on the part of the District Court. And he found the officer to be credible, of course. Found the officer credible. Pardon me? Found the officer credible, ultimately, yes. But this was not a typical battle of the witnesses, where ultimately the District Court's conclusion is not reviewable because there are two witnesses, and he has to make a determination about the credibility of those witnesses. And for all practical purposes, not reviewable. In this case, we have a videotape. It's contemporaneous evidence. When we look to the most glaring lie, if we will, with respect to Officer Allen's testimony, it's perhaps the DWI, the allegation that he extended the motor vehicle stop because he suspected that the driver was driving while intoxicated. The government suggests there's corroborating evidence, and indeed the District Court suggested that there was corroborating evidence of the DWI, even though the video itself clearly shows that no DWI was suspected at the time. Wasn't it corroborated by the testing at the police station? I'm sorry? Wasn't it corroborated by the testimony of the testing at the police station? That's what evidence the government offered, was the videotape of the driver at the police station. But the law is very clear that only the facts known to the officer at the time of the decision to extend the stop are relevant for purposes of the reasonable suspicion. Well, based on his age, he shouldn't have had any alcohol in his system at all while driving, right? Isn't that the law? That is the law. But the officer at the time of extending the stop would still have to suspect that he'd been drinking, and I would submit that that's the evidence that's missing on the videotape. Not one time did this officer tell either his backup or any of the Asbury Park officers who had arrived that he thought that there was a DWI. He didn't conduct any field sobriety testing. He didn't tell the... Yeah, but there's reason, as explained by the district court, for much of that. I'm just speaking only for myself here. I have rarely seen a case that was so thoroughly and well handled by the parties and the district court. There was a real attention paid. You did a wonderful job. The government did a wonderful job, and Judge Bozzano held two days of hearings, and then he... It was a very, very carefully done case. But you're not here writing on a clean slate. You are here with Judge Bozzano's fairly extensive findings of fact and conclusions of law, and, yes, credibility determinations. You may not agree with all of them,  Well, I would suggest that when there is documentary evidence contemporaneous to the stop, and it is so flatly contradictory to what the testimony was, that any credibility determination by the district court... What is so flatly contradictory, such as to result in reversible error here? Well, I think the DWI is the most important one, but there are many others. The fact that he testified that there were tinted windows when there weren't. Well, but he may have thought there were tinted windows, and he may have thought that it didn't have a license plate, and someone later saw that it did. But the officer, if he made a valid stop at the outset, that's all we need to find. You're not contesting that it was a valid stop, right? I'm not contesting it was a valid stop, only for the reason that when he ran the plate, the registered owner's license was suspended, and I would concede that that permitted the stop. I mentioned the other factors, because I think that whether or not a car has a license plate, when you've testified that you had an opportunity to see the front of the car, that is not the kind of thing that one is mistaken about. And when you've got testimony before the court that says that when it was picked up from Impound that it had the plate on it, that those types of facts suggest it's not a mistake. I also suggest when you look at the record of the car. The judge did not make findings of the fact that there was no front plate on or that the windows were not tinted, although he didn't think they were. What he said is that the officer perceived it as such. I appreciate that was the ruling, and I'm suggesting that when you look at the record as a whole, that that was a clearly erroneous finding on his part, and that he couldn't couch Officer Allen's testimony, which was untruthful in the... What's the word I'm looking for? He couldn't couch it in terms of what his perception was when evidence indicated... You said his testimony was untruthful. Yes. In every respect? Well, I think in all important respects. It was not just the fact that there was a DWI later on in the stop. He testified that he fully did a pat-down of the driver, which he never did. Why don't we talk about the fact that it was 2 o'clock in the morning, that even though one backup officer came fairly quickly, there were three men in the car acting fidgety, putting their hands down, and more backup was required. And when that backup came, and it's a little unclear whether it was 10 or 13 minutes later or 18 minutes later, at that point the officer was told there had been a shooting less than a quarter of a mile away, and that three African-American men in dark clothing in an SUV, such as were in this car, were involved. That's what you have to deal with here. And then forehand was ordered out of the car and patted down, as was the driver, because there were more backup there. It wasn't any longer three against two. That's what you have to factor in, the circumstances here. I would submit that you only reach that analysis if you assume that it was proper to extend the stop to begin with, and that he didn't know any of those facts with respect to the shooting prior to that, and that the rule is that the police have to pursue a means of investigation for the original stop as expeditiously as possible. And there's no way at one point in your brief that they should have let them go. When the officers saw that the driver was a proper driver, in the sense he had a license or whatever it was, or the license had not expired, that was the father's license, you say at one point of your brief he should have let them go. What, a drunk and two others let them go in the middle of the night? Well, again, I disagree that the record supports a finding that the driver was drunk at that stage when the officer decided to extend the stop. I'm looking at my time here, and if I may I'm going to move on to the sentencing issue. Counsel, if you could address the – I assume you all got the Johnson case. Yes. Perhaps you could – you haven't had a chance to explain how that might impact your argument. Perhaps you can deal with that. Certainly. I think that the Johnson case supports my argument that it reaffirms the analysis that the court must undertake with respect to any analysis of what offense might constitute a violent felony, and that there is certainly in that case a reaffirmation that any time the court is presented with a statute that permits conviction on both intentional or reckless mens rea, that as a divisible statute, that the court can look behind the words of the statute to determine under what provision of that statute did the defendant ultimately get convicted, and that in doing so there are a limited number of documents that the court can look to. In that particular case, the documents weren't there to make a determination about whether or not it was reckless or intentional, but I would suggest that in our case we do have the documents and in each instance the government was not able to show that Mr. Forehand was convicted on anything other than a reckless standard. If you knock out one of these, then you will have succeeded, correct? Well, there were four convictions. It's my understanding from reading the government's brief that they're not pressing forward with one of the terrorist threats. The last one was joking or whatever. That's correct. And so with the three, that's correct. And which one does not fit the crime of violence and why? None of them do. Unless you give us your best. You say none of them do not because they don't, but because the judge was not clear enough, the plea colloquies weren't clear enough in making as to which it was, right? That's your argument. The state judges, is that what you mean? Yes. Yes, absolutely. And, you know, the Johnson court talks about how this is now going to become a case-by-case analysis, but I would look to – I mean, your position isn't that they have to, in a plea colloquy, in state court or wherever the heck the plea is occurring, that they have to plead specifically knowledge or willfulness, right? I mean, certainly you don't need the magic words in order for – No, I think you do need the magic words. At least insofar as it's going to distinguish the conduct from reckless versus purposeful conduct. Absolutely. Judge Rendell's question was a good one. What do you think is your – if you knock out one of these, you win. Yes. Well, let me begin – Which do you think – forget all of them. Which do you think is your strongest? Okay. I think that if you look at the – actually the stabbing, the 1993 aggravated assault in which Mr. Forehand is asked in the colloquy what happened, and he says that he got in a scrap with the victim and that he stabbed him. There was absolutely no follow-up question by the court at the time to determine whether or not the stabbing happened intentionally or recklessly or even negligently, and that is perhaps our strongest argument. I think also that with – I would caution against the government's argument or the government's urging of the court to look beyond anything other than the particular offense to which – for the particular crime that the defendant pled guilty to because I think that in doing so that the court would run afoul of Apprendi. Well, and Johnson says we look to see whether he admitted. Exactly. So it's pretty limiting. Yes. Well, he says here in that plea colloquy, they asked him, you committed a crime of aggravated assault by attempting to cause seriously bodily injury or causing such injury to Lorenzo Carmichael. Tell me about that. The defendant says, we had gotten into it and I stabbed him. Stabbed him. Court, you got into a scrap? Defendant, yes. Court, and what happened? The defendant, I had stabbed him. Court, you stabbed him. Yes. Where did the weapon come from? I had it, the defendant says. It was a pocket knife. And what happened to him as a result of being stabbed, he went to the hospital at 35. A complete omission in the record of any men's violence. I mean, that's not an accidental stabbing. You said at one point in your brief at page 70 that the hitting him with a bat or the other officer with a bat was, you know, the court didn't find it was an accidental. How do you accidentally stab somebody or accidentally hit someone with a bat or accidentally ask somebody if they thought about dying? Well, the standard is not whether or not it was accidental. The standard is whether or not the conduct was reckless. Well, that was the word you used in your brief at page 70. Yes. I think it was what they admitted to, whether they admitted to intentionally doing it to the plea. Exactly. Yes. Or it says, I stabbed him. I mean, what more? Someone could get in a fight, for instance, and in the course of a fight not intentionally use the force of the knife against a person but have in the course of the felony, if you will, a stabbing occur. And so I think that that's precisely the reason why there's got to be an inquiry about mens rea. It's not enough just to acknowledge the actus reus. You also have to acknowledge the mens rea. Okay. Thank you. Mr. Gross is earning his paycheck today. Excuse me, Your Honor? You're earning your paycheck today. Thank you. Ms. Bergman said that the police officer was contradicted by the videotape. I hope that Your Honors have had an opportunity to look at this videotape. And if you may notice that I did, that the most prominent word in this videotape is the word inaudible. It appears 108 times in a 19-page transcript. Could you speak into the mic, please? Sorry. What was the word I couldn't hear? I couldn't hear it either. The word was inaudible, interestingly enough. The word that appears most frequently in the transcript was inaudible. To say that Judge Pisano was required to conclude that Officer Allen was lying because certain aspects of his testimony were not corroborated by this incomplete transcript, I think, is to misapprehend what the district court judge's role is. And also to misapprehend what this court's role is. This court, when it's undertaking clear air review of credibility findings, and that's precisely what we have here. Ms. Bergman says the officer lied, and Judge Pisano got it wrong by finding that he told the truth. Now, let's say you had a situation where Officer Allen said, I stopped the car because it didn't have a rear license plate. You look at the video, and there's a rear license plate on it. And then Officer Allen goes and he unscrews the bolts for the license plate and takes them off. And Judge Pisano said, no, I believe the officer. There was no rear license plate when he stopped. In that kind of limited context, I think, only in that extreme context could the court say that a district court judge who heard all the evidence, and Judge Berry, I absolutely agree with you. Ms. Bergman did a terrific job in the district court impeaching Officer Allen or attempting to impeach his testimony. And Judge Pisano listened to all of that very carefully, and he accepted briefing on it. And he listened to that videotape repeatedly. And he exercised his proper function of a district court judge as a finder of fact to conclude that Officer Allen was credible on the key points that the government needed to establish in order to get the final result, which was that the officer had authority to conduct a frisk in this case. And what were those facts? We're past the point of arguing about whether or not the initial stop was lawful. What Ms. Bergman focuses on is that Officer Allen couldn't have smelled, couldn't have believed that Vennie was driving drunk because the videotape doesn't have him saying at any point, are you driving drunk? It doesn't have him saying to the other officers, he's driving drunk. Well, if we had an audio tape that captured every word, and this audio tape does not do that, in which the officer never talks about drunk driving, that might be suspicious, but for the fact that Vennie is clearly driving drunk. He's at .15 an hour later when, you know, the officers finally get him to blow into the breathalyzer. He didn't drink any alcohol in between the time that he was arrested and the time that he blows into the breathalyzer. He's drunk when he's pulled over. There's certainly probable cause to believe he's drunk. It may be odd that Officer Allen didn't talk about drunk driving, at least as far as the videotape shows, but the videotape is incomplete. And you know that not only by the fact that the person who transcribed the videotape said it was of poor quality, a fact that you can confirm yourselves when you listen to the videotape, but also there is a point when the gun is finally removed from Mr. Forehand's pants, and Officer Allen yells, gun. And you know he said gun because all hell breaks loose, and everybody is down on the ground. But if you listen to the videotape and you read the transcript, you won't hear the word gun, and you won't read the word gun in the transcript, because that videotape is just not sufficiently complete and audible to say that it contradicts Officer Allen so completely that Judge Pisano committed clear error by finding that he testified truthfully. So I think that my opponent would concede that if Officer Allen had reasonable suspicion, he doesn't need probable cause, he just needs reasonable suspicion, that Benny is driving that car under the influence, he can keep that car there in order to conduct an investigation of possible drunk driving. It's eminently reasonable for him not to engage in field sobriety tests until the police outnumber the occupants of the car. And by the time that the police come and he has sufficient backup to conduct the field sobriety tests, at which point Ms. Bergman says, well, where's the field sobriety tests? He obviously didn't think the guy was driving drunk. Well, at that point, and the audio tape is a double-edged sword for Ms. Bergman, there are instances on that audio tape that fully corroborate Officer Allen's testimony. And one of the things that corroborates is that there was a police officer, at least one police officer at the scene who's talking to, where the videotape captures a conversation where that officer is talking to Officer Allen about the fact that there was a shooting previously, there were three suspects, there was a blue car. Now, does the tape corroborate every detail of Officer Allen's testimony? No, but it certainly tells you that one of the officers who showed up at that scene had information about that shooting. And once the officers believe that they're dealing with possible suspects in a shooting, for them to not conduct field sobriety tests at that point is perfectly proper police practice. So, if the stop is appropriate, it was prolonged sufficiently until you get to the point where Officer Allen takes a forehand out of the car. Officer Allen testifies that the defenses are fidgety and making furtive movements. The videotape not only doesn't contradict that testimony, it can't contradict that testimony because the videotape can't see into the passenger compartment of the car. There is one point where the videotape corroborates Officer Allen, where he says, I told him to keep his hands out of his pockets, and that happens before the frisk takes place. Because earlier in the tape, Officer Allen directs him and he says, don't reach for anything. Maybe when Officer Allen said, I repeatedly told them not to put their hands in his pocket, perhaps he was thinking of that. But that certainly was a permissible inference for Judge Pisano to draw. Judge Pisano is sitting there in the courtroom as a district court judge, listening to that testimony live. And there are aspects of that testimony that are unavailable to the four of us, such as did it sound like Officer Allen was prevaricating? How quickly did he answer the questions? Did he pause? Were there any nuances to his testimony that suggested that he was being untruthful or fabricating? None of that is available to the Court of Appeals, and that's why when you're reviewing a credibility finding, you give the utmost deference. You say it's unreviewable. This Court said it was unreviewable. One of the great cases ever out of this circuit was handled by my husband many years ago. That's an old case. It is an old case, and Bessemer, the Supreme Court case, does say that findings of fact are reviewable. But there's different kinds of findings of fact. There's findings of fact that are drawn from documents. There's findings of facts that may be drawn from videotapes. But findings of fact that are based on testimony deserve the highest possible deference, and I submit it. Ms. Gross, can I move you on to the armed career criminal act? Now, in Johnson, the government withdrew its contention that a reckless offense would qualify as a crime of violence. Have you withdrawn that here? I don't make the argument here that any of these three prior convictions are crimes of violence under the residual clause of the armed career criminal act, if they were merely reckless. If they were, pardon me? If they were merely reckless. But there are two provisions of the armed career criminal act. There's the elements clause, and there's the residual clause. Does it matter which we use? In this case, for example, where I think it's hard to say that aggravated assault, terroristic threats, are other than purposeful, violent, and aggressive conduct. I mean, would it really matter whether we analyze this under the elements clause or the residual clause? I think you can get to the same result under either clause. But for the elements clause, because it… Well, let's talk about which crime you're talking about. Well, assault. Let's talk about the aggravated assault that is the simple assault on the police officer, the 2,000 aggravated assault. And that's similar to the crime in Johnson. That's exactly. That's right. It is a simple assault. Although, Your Honor, it is, I would argue, an offense that's more deserving of consideration under the armed career criminal act. What is the purpose of the armed career criminal act? The Supreme Court told us about that in the Begay case. They said, we want to identify people who are more likely to use a gun to commit a crime of violence. And I would suggest that someone who assaults a police officer is a more dangerous individual, and someone who's more likely to use a firearm aggressively than someone who gets into a bar fight with their neighbor. Except Begay didn't really look at ACCA that way. It really said, under the residual clause, we've got these four crimes, and then we have to assess whether the degree of risk of injury and the purposeful, aggressive, violent nature is like that. Now, in Johnson, we really charted the course for that police assault here because we said we have to look at the plea to see whether he looked to the, did he intentionally do this? Did he admit to that in his guilty plea? Here we have the plea, and there is no plea to intentional assault. So doesn't that answer the question that here, indeed, you have a possibly reckless, possibly intentional assault, and when you step back, a la Begay, and look at your typical simple assault, which could be reckless or intentional, you have to say it doesn't fit under the residual clause. The question is whether these pleas, whether he pled to intentional conduct. Not intentional conduct, whether he admitted that he intentionally did this. That's the question. That's a very narrow question. And we have the plea, and it does not say. It doesn't say that in so many words, Your Honor. Well, in Johnson, we're saying it has to say in so many words. No, I don't think so, Your Honor. What did the court say in Johnson? There you didn't have the guilty plea. We don't know what's going to show up in that guilty plea colloquy yet. You have the information, and the information charges that the defendant hit slash choked the victim. And the court said that's very close. Admittedly. That almost shows intentional conduct, just those two words. That he struck or choked strongly suggests. However, they didn't have the plea. So they needed to go back and see whether he pled to, clarifies, the mens rea to which Johnson actually pled guilty. Here we have the plea colloquy, and it does not say I intentionally and knowingly assaulted and hit this police officer with a stick. So we have the answer. So knowing the answer, we know that the possibility under A-1 is that it was reckless or intentional. And given that, we have a reckless or intentional assault, simple assault. And under Big A, it does not fit the necessarily violent, aggressive, purposeful. So we have the answer. So it can't qualify. Your Honor, if the defendant makes admissions, and what are the admissions that are made with respect to the aggravated assault of Mr. Carmichael, the one who Ms. Bergman says is her best case? He says, I stabbed the victim. Pardon? He said, I stabbed the victim. But he didn't say, according to Judge Rendell, the essential word I intended to stab him. He wasn't asked that. That's too bad. But if he wasn't, then it could have been reckless or intentional, and that's really what Johnson said. If the rule is, and I don't think that any case has held this, if the rule is that the defendant in the prior case has to say, with those precise magical words, I intentionally struck him, and I just don't see how Johnson holds that, Your Honor. It does. It says whether Johnson actually admitted to acting intentionally or knowingly. I stabbed him. Johnson may place a very high burden, but if he didn't, then we look at that crime as a reckless or an intentional crime, because it's not necessarily intentional. And under Bigay, we then step back and say, the typical reckless or intentional simple assault is that the purposeful, violent, aggressive, likely. Your Honor, imagine a situation where the defendant says, I got into a fight with somebody. I was very angry at him. I really wanted to hurt him, and I stabbed him. And I didn't lose control of the knife. I had complete control of the knife, and I stabbed him. We might find that that means that he actually admitted to acting intentionally or knowingly. We might. But here we don't have that. But you've got something close to that. And, Your Honor, what you're saying is he doesn't have to use the magic words. But he said he hit him with a stick. No, that's another. No, no, no, Your Honor. No, that's the police. No, no, I'm talking about the first aggravated assault, the 93 aggravated assault. Oh, I'm sorry. I was talking about the police one. All right. Well, Your Honor, that one. Because the police is the one that's just like USB Johnson. It has the simple assault on a police officer. Right. But that one, Your Honor, we've got a plea to an additional offense, which is possession of a weapon with an unlawful purpose. And Mr. Forehand says my purpose in possession, possessing that stick or bat or baseball, was to strike the police officer. So you've got it there. Now, Mr. Forehand. The question here, as I read what Judge Rendell is asking, and she's much more eloquent than I am, is he had to have used the word intent to have committed an intentional crime. I think that's that's. Or state that the act that he did, he did intentionally or knowingly, and he had to admit that. I'm just going by what Johnson said. He had to have said in his plea, I intentionally or knowingly did this. Because we have to find, I'm just saying what he said in Johnson. I'm just repeating it. Okay. It may place a big burden. It may mean that henceforth prosecutors are going to ask for findings or admissions in pleas to the intentional nature of acts so that later it's a crime of violence. I don't know. It makes us jump through hoops. But I wasn't on the panel. Okay. Well, I think I've made my argument. I don't think you need the magic words, but I understand you disagree with me. No, I'm not saying what I agree to or not. I'm just saying how I read Johnson. You may disagree. I see I'm out of time. Does the Court have any other questions? No. Thank you. Thank you very much. Rebuttal? I did reserve rebuttal time, but unless the Court has questions for me, I don't have any additional points I'd like to make. No, thank you very much. Thank you.